# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 14, 2010 Session

## STATE OF TENNESSEE v. DEREK DEON HESTER

### Direct Appeal from the Circuit Court for Fayette County
#### No. 6085 & 6147    J. Weber McCraw, Judge

---

### No. W2009-01608-CCA-R3-CD  - Filed June 29, 2011

---

The defendant, Derek Deon Hester, stands convicted of felony murder; aggravated child abuse, a Class A felony; and aggravated rape of a child; a Class A felony.  The trial court sentenced him as a Range I, violent offender to a life sentence for the felony murder conviction; as a Range I, violent offender to twenty years for the aggravated child abuse conviction, to be served concurrently with the life sentence; and as a Range III, violent offender to forty years for the aggravated rape of a child conviction, to be served consecutively to the life sentence, in the Tennessee Department of Correction.  On appeal, the defendant argues that the state withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); that the trial court erred in granting the state's motion to consolidate the cases; that the trial court erred in the admission and exclusion of certain evidence; and that the evidence was insufficient to support his convictions.  Following our thorough review of the record, the parties' arguments, and the applicable law, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Paul Springer, Memphis, Tennessee, for the appellant, Derek Deon Hester.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Walt Freeland, Terry Dycus and Joe Van Dyke, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

On July 28, 2008, a Fayette County grand jury returned an indictment in case number 6085 charging the defendant, Derek Deon Hester, with the felony murder and aggravated child abuse of the victim. On November 24, 2008, a Fayette County grand jury returned an indictment in case number 6147 charging the defendant with the aggravated rape of the victim, a child under three years old. Prior to trial, the state moved the trial court to consolidate the cases. The court granted the motion over the defendant's objection. The matter proceeded to trial on March 16, 2009.

*State's Proof.* Dr. Karen Elizabeth Chancellor, the Chief Medical Examiner of Shelby County, testified that she performed the autopsy of the victim. Dr. Chancellor testified that her external examination of the victim showed evidence both of injury and medical intervention. She explained that the victim had been hospitalized for three hours prior to her death, and a medical team performed a neurosurgical procedure on her head to remove blood from inside of her head. As for the victim's injuries, Dr. Chancellor observed abrasions on the right side of the victim's forehead, scratches and abrasions on her right cheek, an abrasion and scratches on her left eyelid, a small tear and abrasion on the inside of her upper lip, a bruise on the inside of her lower lip, a horizontal red mark above the left buttock, and another horizontal red mark above the right buttock. Upon inspecting the victim's genitalia region, Dr. Chancellor further observed that the victim's labia majora was swollen and red, that there were multiple foci of redness around the urethra, and that there were injuries to the anus. Dr. Chancellor testified that there were four tears of the tissue surrounding the anus and an abrasion near the anus. She opined that blunt force caused these injuries.

In her internal examination, Dr. Chancellor observed that the surgeons had removed a portion of the victim's skull, and the victim's brain was swollen to the point that it protruded from the surgical defect. Dr. Chancellor testified that there was some hemorrhage on the portion of the brain that was protruding. She noted in her examination that there were several deep scalp contusions caused by blunt force injury: one on the back of the head, two on the right side of the head, and one on the left forehead. Dr. Chancellor testified that the victim had a subdural hemorrhage on the right side of her brain, multiple areas of acute subarachnoid hemorrhage, a brain contusion on the left side, and a left uncal herniation. She explained that the uncal herniation occurs when the swelling of the brain causes the brain tissue to move "downward through the canal where the spinal cord is," which she characterized as an "irrevocable brain injury." Dr. Chancellor explained that she found hemorrhaging on the optic nerves that connected both eyes to the brain and multiple retinal hemorrhages in both eyes. She testified that retinal hemorrhaging was a sign of head injury. Also as part of her internal examination, Dr. Chancellor testified that she found deep contusions on both buttocks. She found bruising of the perirectal tissue that extended two inches upwards from the anus, indicting penetration of the anus and rectum. Dr. Chancellor also found a bruise on the victim's tongue, "probably caused by biting of the tongue."

-2-

Dr. Chancellor testified that the hemorrhages on the victim's brain, buttocks, tongue, and eyes were "fresh," meaning that there was no white blood cell reaction. As for the hemorrhaging around the anus, she noted "an early neutrophilic response [meaning] that as a response to the damage to the injury there, white cells were coming in, in an attempt to repair." She opined that the timeline for that injury was "hours to a day or two."

Dr. Chancellor testified that she determined the cause of death to be multiple blunt force injuries to the head and the manner of death to be homicide. She also determined that there was evidence of penetration of the rectum. Dr. Chancellor testified that in making her determination, she reviewed the victim's medical records from LeBonheur Children's Hospital ("LeBonheur") and information from law enforcement agents. Dr. Chancellor opined that the injury to the back of the victim's head would not have been caused by being dropped from a height onto carpet, but she said that it could be caused "if the head was rocked against that carpet." She reiterated that the injuries were not accidental.

On cross-examination, Dr. Chancellor testified that all of the victim's injuries "appear approximately the same age." She further testified that constipation or diarrhea would not have caused the injury to the anus.

Angela Mason testified that she was the victim's mother. She last saw the victim on March 3, 2008, the date of the victim's death. Ms. Mason testified that she and her two daughters, the victim and her sister, lived with the defendant. She said that she and the defendant had dated for a year and a half. Ms. Mason testified that she, her daughters, and the defendant all slept on the same mattress. Ms. Mason testified that the victim was healthy and happy, but she did recall that the victim had a red mark on her face three weeks prior to her death and that the victim had trouble with potty training. She agreed that the Department of Children's Services ("DCS") had investigated a report that the victim was failing to thrive after she was born, but "that was cleared up." Ms. Mason testified that the last time anyone had used the bathtub in their house was the Saturday morning before the victim's death.

Ms. Mason said that she woke up at 4:30 a.m. on March 3, 2008, and woke her daughters up. The victim used the toilet with no problems, and Ms. Mason washed her in the sink. She said that she washed the victim's buttocks and did not notice any injuries, and the victim did not complain. Ms. Mason testified that she regularly washed the victim and had not noticed any injuries other than the red mark on her face. Ms. Mason said that she dressed the victim in purple pants and a pink shirt, which she identified for the court. She testified that she put the pants on the victim the right way, but at trial, the pants were turned inside out. Ms. Mason identified a second shirt that had "Pooh" written on it as belonging to one of her daughters, but she said that she did not put it on the victim that morning and she had no knowledge of how the shirt came to be on the victim when she arrived at LeBonheur.

Ms. Mason testified that on a normal day, her sister-in-law would take her to work, and they would drop her daughters off at her mother's house on the way. The morning of March 3, however, she, her daughters, and the defendant took a borrowed car and stopped for gas on the way to her work. The defendant dropped her off at work, and her daughters began crying when she got out of the vehicle. She testified that she clocked in at work at 5:46 a.m., and the defendant was supposed to take her daughters directly to her mother's house. Ms. Mason said that the defendant had never been alone with her daughters before that day.

She said that she and the defendant had disagreed over how to discipline her daughters because the defendant tried to get her to "whoop them." Ms. Mason testified that the defendant had a paddle that he had gotten from neighbors on which he had written "whoop ass." She said that the paddle had been in their home for less than a week before the victim's death. She never saw him use it, and she never used it herself.

On cross-examination, Ms. Mason testified that DCS investigated the complaint that the victim was failing to thrive when the victim was being treated at LeBonheur for an infection. Ms. Mason said that she would sometimes spank her daughters' hands or on the leg. Ms. Mason recalled that at exactly 8:00 a.m. on March 3, 2008, someone came to her at work and told her she needed to go home. A cousin picked her up and took her to her mother's house, where the victim was in the ambulance. She was not able to see the victim until just before her surgery.

Betty Jean Mason testified that she was Angela Mason's mother and the victim's grandmother. Mrs. Mason said that she had only seen the defendant a couple of times and did not know him well. She testified that on March 3, 2008, she woke up at 5:00 a.m. because she was expecting her daughter to drop off the grandchildren. When they did not come, she thought they might have stayed with their mother. At some point in the morning, she received a call from the defendant, who told her that something was wrong with the victim and that she was unresponsive. He pulled into her yard and got out of the truck, carrying the victim and holding the victim's sister by the arm. The defendant brought the victim into Mrs. Mason's house and laid her on a couch. Mrs. Mason said that the victim did not move at all and did not respond to her calling the victim's name. When Mrs. Mason touched her, the victim "jumped" but did not otherwise move. She said that the victim's pants were wet, so she began pulling them off of her and noticed that the victim was not wearing any underclothes. When she asked the defendant why the victim was not wearing underclothes, he responded that she did not have any because she had "peed in all of them." Mrs. Mason also noticed that the victim's pants were on inside out and that her shirt was dry. She said that the defendant called Tangela Mason, Angela Mason's aunt, who came over to

Mrs. Mason's house. Mrs. Mason said that Tangela Mason took the victim and said that she was going to take her to the emergency room.

Tangela Mason testified that she was Mrs. Betty Jean Mason's sister-in-law and Angela Mason's aunt. She lived within walking distance of Mrs. Mason's house. She saw the victim in the days prior to her death and did not observe anything wrong with her. Tangela Mason recalled that on March 3, 2008, she was awakened by a phone call from the defendant, who told her that something was wrong with the victim and that they were at Mrs. Mason's house. She drove to Mrs. Mason's house, and when she entered, she saw the victim lying on the couch. The victim did not respond to her, so she picked her up to carry her to her car. She told Mrs. Mason that she would take her to the hospital. Tangela Mason put the victim in her car and drove back to her house so that she could change clothes before going to the hospital. She said that before she could get out of the car, the victim appeared to stop breathing. When she rubbed the victim's stomach, the victim jumped. Tangela Mason said that she realized something was very wrong, so she called 911. Tangela Mason's sister arrived and began performing CPR on the victim before the First Responder arrived and took over the CPR. Tangela Mason said that Air Wing Helicopter transported the victim to LeBonheur. Tangela Mason recalled seeing what appeared to her to be carpet burns and small bruises on the victim's face that she had not seen the day before.

Trina Montague, a paramedic with the Fayette County Ambulance Service, testified that she and her partner received a dispatch call on March 3, 2008, at 7:38 a.m. They responded at 7:39 a.m. and arrived on the scene at 7:57 a.m. The First Responder ran to the ambulance with the victim in her arms as soon as the ambulance arrived and handed the victim to Ms. Montague and her partner. Ms. Montague said that they laid the victim on a stretcher and noticed that she was unconscious and unresponsive but breathing. She testified that the victim had on pants but no underwear, and the pants were soaked in fresh urine. They removed her pants and put a diaper on her. They began treating the victim and called the helicopter to transport the victim. Ms. Montague testified that she noted in her report that the victim had a hematoma on her forehead, bruising, and swelling above her left eye and beside her right eye. She further noted in her report that it "appear[ed] to be a newer injury [and did] not appear to be older." Ms. Montague testified that she prepared her report immediately after the helicopter flew the victim out.

Jason Hamilton testified that he was Ms. Montague's partner on March 3, 2008. He said that he removed the victim's clothes and placed them on a bench in the ambulance. After the victim was transported by helicopter, he realized that her clothing was still in the ambulance, so he contacted the sheriff's office, who retrieved the clothing.

Captain Ricky Wilson, of the Fayette County Sheriff's Office, testified that he received the victim's shirt from Jason Hamilton. He put the item in a bag and gave it to Investigator Drewery. Captain Wilson testified that Investigator Drewery met the defendant at LeBonheur, and the defendant voluntarily returned with the investigator to Fayette County. Captain Wilson met the defendant at the justice complex. They had the defendant remove his clothing and put on jail clothes because they wanted to preserve any evidence that might be on his clothing. Captain Wilson placed the defendant in an interview room, asked to speak with him, and advised him of his *Miranda* rights. The defendant signed a waiver of rights form and agreed to provide a DNA sample. Captain Wilson said that he and the defendant talked about his background and what he and the family had been doing over the previous twenty-four hours. The defendant wrote out a statement saying that after they took Angela Mason to work, he and the children returned home so that he could change clothes before paying the electric bill. He wrote that he asked the victim's sister to put the victim's jacket on her, but the sister replied that the victim was asleep. He went to check on her and "discovered that [the victim] was not acting herself," so he took her to her grandmother's house and called "the aunt" to help.

Investigator Phil Drewery, of the Fayette County Sheriff's Office, testified that Captain Wilson informed him at approximately 9:00 a.m. on March 3, 2008, that the victim had been transported by helicopter to LeBonheur with severe head injuries. Investigator Drewery went to LeBonheur because the victim's mother and her boyfriend, the defendant, were there. He spoke with the victim's mother, who told him that she, the defendant, and her children went to her workplace that morning, and the defendant was supposed to take the children to their grandmother's house after dropping her off at work. After speaking with the victim's mother, Investigator Drewery began talking to the defendant, but they were interrupted by a nurse who announced that the victim was about to go into surgery. Investigator Drewery then spoke to Dr. Catherine Cox, who informed him that the child was unresponsive, had severe trauma to the head, and had anal bleeding. Investigator Drewery decided at that point that he should take the defendant back to Fayette County because he was concerned for the defendant's safety considering that the victim's family members, who were at the hospital, knew that the defendant was the last person with the victim, and because the defendant was a person of interest. The defendant agreed to go with him. Investigator Drewery said that policy required him to perform a pat-down of the defendant and place him in handcuffs. Investigator Drewery stated that the defendant was "fully cooperative." They drove to the county line, where a deputy met them and completed the defendant's transport to the justice complex.

Investigator Drewery went to the victim's home after dropping off the defendant with the deputy. He testified that the victim's mother had given him permission to search the home, and the defendant had given him the key. He began taking photographs as soon as he

-6-

walked in the door. While at the residence, he received a phone call from LeBonheur that the victim had died. Investigator Drewery testified that he saw three drops of what appeared to be blood on the carpet of the home and a napkin in the kitchen that also appeared to have blood on it. He saw tissue paper in the bathroom's trash can that appeared to have blood on it, and he noticed large drops of water in the bathtub. Investigator Drewery found more drops of what appeared to be blood in the entrance to the master bedroom. He testified that he sent all the items that appeared to have blood on them to the crime laboratory. He said that one piece of tissue paper from the bathroom trash can had the defendant's DNA on it, but neither his DNA nor the victim's DNA was found on anything else. Investigator Drewery testified that he found a long-sleeved pink shirt in the bedroom of the family's home, and it was "saturated." He reiterated that the shirt "was wet[,] very wet." Investigator Drewery testified that he spoke with Betty Mason and Tangela Mason on March 3, 2008, and collected the victim's purple pants from Tangela Mason.

Investigator Drewery testified that he spoke with Dr. Chancellor, the medical examiner, on March 4, 2008, and then interviewed the defendant. The defendant agreed to speak with him and signed a waiver of rights form. Investigator Drewery said that the interview lasted approximately five hours, including breaks, and the defendant ultimately wrote out a statement by hand. In his statement, the defendant wrote that the victim fell to the floor and hit her head while he was putting her sister in bed. After her sister told him that the victim would not wake up, he noticed that she was not breathing properly and had drooled on her shirt. He removed the shirt she was wearing and put her in a shirt that had "Pooh" written on it. He took the girls to their grandmother's house and called their aunt to help. In a question-and-answer portion of the statement, the defendant explained that the victim hit the back of her head on the floor when she fell. He denied sexually assaulting the victim. Investigator Drewery testified that during the interview, he asked the defendant about the droplets of what appeared to be blood, and the defendant said that the victim's sister had a nosebleed. The defendant told him that the last time that anyone had used the bathtub had been Saturday morning. After Investigator Drewery showed him pictures of water in the bathtub, the defendant told him that he had forgotten to tell Captain Wilson the day before that he had dropped the victim. The defendant did not explain why there was water in the bathtub. Investigator Drewery testified that, in his opinion, the water in the bathtub was connected with the wet shirt he found.

On March 5, 2008, Investigator Drewery spoke again with Dr. Chancellor, who informed him that the victim would not have received the type of injuries she had from a short fall like the defendant described. Investigator Drewery requested another interview with the defendant, who signed another waiver of rights form. The defendant told him that he did not use the bathtub on March 3 nor did he give either the victim or her sister a bath. He said that he dropped the victim when he was putting her sister in bed.

-7-

On cross-examination, Investigator Drewery agreed that the victim's vaginal, oral, and rectal swabs, as tested by the Tennessee Bureau of Investigation ("TBI"), were negative for the presence of semen. Her pants and the long-sleeved pink shirt were also negative for the presence of semen. Investigator Drewery agreed that the only blood found in the residence belonged to an unidentified male and an unidentified female. He testified that the defendant's DNA was found on a piece of tissue paper found in the bathroom.

Dr. Karen Lakin testified that she was the Medical Director for the LeBonheur Child Assessment Program. She explained that the program was a consulting service for the hospital and that they assisted with evaluation recommendations and acted as liaison between the hospital and DCS. Dr. Lakin testified that of the cases of child physical abuse that she investigated, she determined that there was no abuse in approximately one-third of the cases. She said that she and her team evaluated over 400 cases of potential abuse that were admitted to LeBonheur during the year prior to the trial and evaluated another 100 cases of children who were treated in the emergency room but not admitted to the hospital.

Dr. Lakin said that she was called to consult on the victim's case, and she saw the victim in the emergency room. She said that she and her team interviewed the victim's mother to get the victim's history in order to determine treatment. Dr. Lakin performed a physical examination of the victim and noticed "some very concerning injuries that were very obvious on her head [and] forehead." Dr. Lakin described the injuries as multiple abrasions and ecchymosis, which she said were recent injuries. Dr. Lakin testified that during the examination, she observed that the victim was "actively bleeding" from her rectum and had three external tears in her anal area. She testified that she normally would contact the Memphis Sexual Assault Resource Center to collect any evidence of possible sexual abuse, but in this case, the victim's CT scans showed a large subdural hematoma and herniation, so the medical team rushed her into surgery to try to save her life. Because the victim did not survive, the medical examiner's office continued the investigation.

Dr. Lakin testified that subdural hematomas can result from high impact situations, "such as being hit by a car," or when there is "acute acceleration and then an immediate deceleration, such as the head being accelerated very quickly and then stopped by impact." She said that the type of force required to result in such an injury was difficult to quantify but would be a "greater force than what a reasonable person would recognize as being normal activity." Dr. Lakin said that she would agree with another expert's opinion "that this child's injuries to the head were the result of blunt force trauma, possibly four separate blows, maybe more." She testified that the victim's CT scans indicated that the victim had "very, very acute, active bleeding" on her brain. The CT scans did not indicate any prior bleeds nor did it show any skull fractures. Dr. Lakin said that the absence of skull fractures was another indication "of the very violent shaking that probably occurred with a sudden deceleration."

She opined that the ecchymosis and abrasions on the victim's face indicated some type of contact, and the "combination of the acceleration/deceleration and the sudden stopping and the impact . . . caused this injury." She testified that the victim's retinal hemorrhages were "also associated with very significant shaking and acceleration and deceleration and sudden stop." Dr. Lakin testified that in her opinion, the victim's injuries were very recent because she had both internal and external active bleeding. She said that the injuries to the victim's head and rectum were not connected. Dr. Lakin said that a fall from shoulder height onto carpet would not have caused the victim's injuries. She testified that the tears around the victim's anal region were more significant than fissures related to constipation or superficial injuries from a straddle injury sustained in a fall.

On cross-examination, Dr. Lakin said that she was unaware that DCS had investigated a failure to thrive complaint associated with one of Angela Mason's daughters.

*Defendant's Proof.* Annie Hester testified that she was the defendant's mother. She said that he lived with her until he moved out to live with his girlfriend, but she said that he still stayed with her some. She testified that she had advised him not to date Angela Mason. Ms. Hester testified that the defendant was a nice person, and she had not had problems with him.

The defendant testified that he was twenty-three years old at the time of trial. He had finished high school and had a welding certificate from a vocational school. He was not working in March 2008. The defendant testified that he met Angela Mason at his cousin's house, and they eventually began dating. He said that Ms. Mason had two children when they began dating, and she was living with her sister. Sometimes, he spent the night at her sister's house also. In February 2008, he and Ms. Mason and her two children moved into a home together. He said that the only time he kept Ms. Mason's children was March 3, 2008. He said that Ms. Mason would discipline her children with whatever she could get her hands on, and he said that he "was just disappointed how she was disciplining her kids." The defendant said that on March 2, 2008, his neighbor gave him a paint stirrer, and he put the paint stirrer on top of the door and told Ms. Mason to use it to discipline her children.

The defendant said that Ms. Mason woke up at 4:30 a.m. on March 3, 2008, and began getting her children ready. He noticed that the victim's pants were on backwards and told Ms. Mason, but Ms. Mason said it did not matter because they were only going to their grandmother's house. The defendant testified that he rode with Ms. Mason and the children when she drove to work. When he was driving back after dropping Ms. Mason off, he said he was thinking about going to put in a job application and missed the turn to Mrs. Betty Jean Mason's house. He decided to return home and change clothes to make a better impression at the place he was applying. When he got home, he took both children in his arms because

they were asleep. The defendant testified that when he put the victim's sister in the bed, the victim "came out of [his] arms." The victim did not wake up, so he put her in the bed. He changed clothes in another room. When he finished getting dressed, he asked the victim's sister to put her jacket on and to help the victim put hers on. The victim's sister told him that the victim was not responding to her. The defendant testified that when he went to check on the victim, the victim's eyes were rolling into the back of her head, and she was slobbering on her shirt. He changed her shirt so that she did not have to go out in the cold in a wet shirt. He put her jacket on her and took her to Mrs. Mason's house. He said that he did not call 911 from his house because he could not get reception on his cell phone. The defendant said that he called Mrs. Mason as soon as he got signal on his phone. He pulled into her yard and took the victim inside. The defendant said that he called Tangela Mason next. She came over to the house and tried to get the victim to respond. The defendant said that the First Responder arrived and began treating the victim. He testified that no one asked him what happened until the family was at LeBonheur. He said that he told the people who asked what happened that the victim fell out of his arms.

The defendant said that he met Investigator Drewery at LeBonheur and agreed to go with him to Fayette County. The defendant said that he gave a statement to Captain Wilson and gave him a DNA sample. The following day, he gave a statement to Investigator Drewery. He talked to Investigator Drewery again on March 5. The defendant testified that he signed waiver of rights forms on each occasion that he spoke with Captain Wilson or Investigator Drewery. The defendant testified that he saw a bruise on the victim's face sometime in February, but he did not see any injuries on her face when he took the victim to Mrs. Mason's house on March 3. He said that he never saw the victim bleeding.

On cross-examination, the defendant testified that he arrived at Mrs. Mason's house at approximately 6:55 a.m. He said that he did not know how the victim received the injuries to the side of her head or the bruises and abrasions on her face.

Following the close of proof and deliberations, the jury convicted the defendant of felony murder; aggravated child abuse, a Class A felony; and aggravated rape of a child, a Class A felony. The trial court sentenced him as a Range I, violent offender to a life sentence for the felony murder conviction and to a concurrent sentence of twenty years for the aggravated child abuse conviction, to be served in the Tennessee Department of Correction. Pursuant to Tennessee Code Annotated section 39-13-531(b), the trial court sentenced the defendant as a Range III offender to forty years at 100% for the aggravated rape of a child conviction and ordered the sentence to run consecutively to the defendant's life sentence. The trial court denied the defendant's motion for new trial, and the defendant filed a timely notice of appeal.

-10-

**Analysis**

On appeal, the defendant argues that the state withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); that the trial court erred in granting the state's motion to consolidate the cases; that the trial court erred in the admission and exclusion of certain evidence; and that the evidence was insufficient to support his convictions.

I. *Brady* Violation

The defendant contends that the state suppressed the victim's past medical records and DCS records. The defendant concedes that the state allowed defense counsel to copy its file but alleges that the state decided on its own that the victim's records were irrelevant and that it was not obligated to produce them. He further argues that the state was obligated to turn over the records to the trial court for an in camera inspection and to allow the trial court to determine the relevance of the records. The state responds that the defendant has not shown that the state did not produce the records or that the records were material.

In *Brady v. Maryland*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87; *see also Sample v. State*, 82 S.W.3d 267, 270 (Tenn. 2002). In *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule.

The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. *Johnson v. State*, 38 S.W.3d 52, 56 (Tenn. 2001). However, the state "is not required to disclose information that the defendant already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Nor is the state required to disclose information which is not possessed by or under the control of the prosecution or other governmental agency. *Id.*

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the defendant requested the information, unless the information was obviously exculpatory; (b) the prosecution must have suppressed the evidence; (c) the evidence suppressed must have been favorable to the accused; and (d) the evidence must have been material. *See Johnson*, 38 S.W.3d at 56; *see also Bagley*, 473 U.S. at 674-75; *Brady*, 373 U.S. at 87; *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995).

In this case, the defendant has made no argument that the allegedly suppressed records were favorable, material evidence. There is no evidence in the record that the state had any medical records of the victim other than the records of her treatment at LeBonheur on March 3, 2008. The record suggests that the state gave the victim's March 3 medical records to the defendant because the defendant requested a continuance to have time to review the records. The state is not obligated to turn over evidence it does not possess. *Marshall*, 845 S.W.2d at 233. Therefore, the defendant's *Brady* argument related to the victim's past medical records is without merit.

As for the victim's DCS records, the defendant has made no showing that the records contained favorable, material evidence, and the records are not in the appellate record before this court. The trial transcript reveals that the state reviewed the DCS records and found nothing relevant to this case. Additionally, the transcript reveals that DCS refused to release the victim's record.[1] The defendant argues that the state should not be allowed to determine whether potential evidence is subject to disclosure. However, he presents no authority for this argument. The United States Supreme Court has noted that the "[s]ettled practice" is for the state to make the decision on disclosure. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 59, 107 S. Ct. 989, 1002, 94 L. Ed. 2d 40 (1987).

> In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), it is the State that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.

*Id.* While the defendant did make a specific request for exculpatory material in the victim's DCS records, the state determined that there was no exculpatory material therein. If the defendant believed that the state was dishonest in its assessment of the records, the defendant was free to bring it to the court's attention and seek a court order for DCS to disclose the records to the court for an in camera inspection. *See* Tenn. R. Crim. P. 17. In our view, the state fulfilled its obligation under *Brady*, and we conclude that the defendant has not shown

---

[1] DCS records are confidential, and the Tennessee Code Annotated provides that the records can be disclosed by court order to "any law enforcement agency, grand jury or court." Tenn. Code Ann. § 37-5-107. The statutes allow the district attorney general to review DCS records but provides that those records reviewed by the district attorney general remain confidential to the same extent that records not shared with the district attorney general are confidential. *See id.* § 37-1-409. Tennessee Code Annotated section 37-1-409 further provides that shared information that does not become part of a court record - through court order, criminal prosecution, or to the extent required by the rules of criminal procedure - remains confidential.

that the state suppressed favorable, material evidence. He is, therefore, without relief as to this issue.

## II. Consolidation

The defendant asserts that the trial court erred in consolidating the two indictments for trial. Specifically, the defendant argues that because defense counsel objected to the state's motion to consolidate, the trial court should have applied the rule governing the severance of cases. The defendant further argues that the trial court abused its discretion because it did not take proof that the offenses were part of a common plan or scheme or that evidence of the rape would be admissible in a trial for felony murder, and vice versa. The defendant asserts that the trial court's erroneous consolidation of the cases unfairly prejudiced him by allowing the jury to hear "the egregious and offensive allegation[]" of rape, making it "much more difficult for the jury to find the defendant credible" with regard to the felony murder and child abuse charges.

In pretrial proceedings, the state moved to consolidate the three cases pursuant to Rules 8 and 13 of the Tennessee Rules of Criminal Procedure. Rule 8(b) provides that two or more offenses may be "consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character." Rule 13 allows the trial court to consolidate the offenses if the offenses could have been joined in a single indictment pursuant to Rule 8 or sever the offenses if the prosecution or defense could have obtained a severance under Rule 14. *See* Tenn. R. Crim. P. 13(a) and (b). The defendant opposed the state's motion. "[W]hen a defendant objects to a pre-trial consolidation motion by the state, the trial court must consider the motion by the severance provisions of Rule 14(b)(1), not the 'same or similar character' standard of Rule 8(b)." *Spicer v. State*, 12 S.W.3d 438, 443 (Tenn. 2000). Pursuant to Rule 14(b)(1), "the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others." *Id.* at 445.

The first prong of Rule 14(b)(1) requires a showing that: (1) the offenses are of distinctive design or are signature crimes; (2) the evidence demonstrates a larger continuing plan or conspiracy; or (3) the offenses are part of the same criminal transaction. *State v. Moore*, 6 S.W.3d 235, 240 (Tenn. 1999). "The same transaction category involves crimes which occur within a single criminal episode." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn. Crim. App. 1993). Also, a common scheme or plan may be supported by evidence of "groups or sequences of crimes committed in order to achieve a common ultimate goal or purpose." *Id.* The larger, continuing plan classification has been reserved for cases involving evidence of crime sprees demonstrating the commission of several crimes closely related in time. *See State v. Allen Prentice Blye*, No. E2001-01375-CCA-R3-CD, 2002 WL

31487524, at *6 (Tenn. Crim. App., at Knoxville, Nov.1, 2002), *perm. app. denied* (Tenn. Mar. 10, 2003).

The second prong of Rule 14(b)(1) requires a showing that the evidence of one offense would be admissible in the trial of the other offenses. Therefore, the question of evidentiary admissibility must be addressed. *Spicer*, 12 S.W.3d at 445. The trial court must conclude that: (1) evidence of each offense is relevant to some material issue in the trial of the other offenses; and (2) the probative value of the evidence of other offenses is not outweighed by the prejudicial consequences of admission. *Id.* "Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion." Tenn. R. Evid. 404(b). However, evidence of "other crimes, wrongs, or acts" may be admissible for "other purposes" such as proving identity, criminal intent, or rebuttal of accident or mistake. *Id.*; Tenn. R. Evid. 404, Advisory Comm'n Cmts. To determine whether evidence of other crimes, wrongs or acts is admissible for a purpose other than to prove that the person acted in conformity with a character trait, the trial court must determine whether "a material issue exists other than conduct conforming with a character trait," and the court "must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice." Tenn. R. Evid. 404(b)(2) and (4).

Generally, if the trial court complied with the Rules of Criminal Procedure, its decision to consolidate offenses will not be overturned absent an abuse of discretion. *State v. Toliver*, 117 S.W.3d 216, 231 (Tenn. 2003); *Spicer*, 12 S.W.3d at 442. In this case, the trial court issued an order stating that the state's motion for consolidation was well taken, but the court made no findings of fact regarding whether the offenses were part of a common scheme or plan nor did the court consider the admissibility of evidence of each offense in the trial of the other offenses. Therefore, the court applied an incorrect legal standard. *See State v. Garrett*, 331 S.W.3d 392, 404 (2011). To determine whether the trial court improperly consolidated the offenses, we must conduct the analysis that the trial court failed to conduct. *Id.* Because the trial court did not take any proof in this matter, we will conduct the analysis based upon the evidence presented at trial. *Id.*

At trial, the victim's mother testified that the victim was healthy when she washed her before work on March 3, 2008. She did not see any tears around the victim's anal region. The defendant was alone with the victim and her sister from the time the victim's mother went to work until he took the unresponsive victim to her grandmother's house. The medical testimony established that all of the victim's injuries were recent. Dr. Lakin testified that in her opinion, the victim's injuries were very recent because she had both internal and external active bleeding. Dr. Chancellor testified that the hemorrhages on the victim's brain, buttocks, tongue, and eyes were "fresh," and that there was an early white cell response to

the hemorrhaging around the victim's anus. She opined that the timeline for that injury was "hours to a day or two." Dr. Chancellor testified that all of the victim's injuries "appear[ed] approximately the same age." In our view, the proof supports the conclusion that the offenses charged in the separate indictments were part of the same criminal transaction because the offenses involved the same victim and were very closely connected in time and place; thus, the first requirement under the Rule 14(b)(1) analysis is met.

The second requirement that a showing that the evidence of one offense would be admissible in the trial of the other offenses is also met. In a trial for felony murder and child abuse, a material issue would have been that the victim's head injuries were a result of an accident. Proof of the rape would have been relevant to rebut a theory of accidental injury and to show criminal intent. In a trial for rape of a child, the evidence of the child's head injuries, which led to her death and to the felony murder and child abuse charges, would have supported the state's theory that diarrhea, constipation, or a straddle fall did not cause the damage to the victim's anus because the victim could have sustained the injuries during the rape. Therefore, the evidence of each offense is relevant to some material issue in the trial of the other offenses.

Furthermore, the probative value of the evidence is not outweighed by the danger of unfair prejudice. Evidence of each offense - that the child sustained four blows to the head and that something penetrated the child's anus - was certainly damaging; however "the mere fact that evidence is particularly damaging does not make it unfairly prejudicial." *State v. Gentry*, 881 S.W.2d 1, 7 (Tenn. Crim. App. 1993). The proof of the separate offenses was sufficient without proof of the other[2]; therefore, there was no danger in this case of the jury inferring the defendant's guilt based on a perceived propensity to commit similar offenses or of "encourag[ing] the jury to bolster the proof of each crime with proof of the other." *Garrett*, 331 S.W.3d at 406. Thus , the record supports the consolidation of the offenses.

We conclude that the trial court's failure to follow the proper procedure for consolidation was an abuse of discretion because the court applied an incorrect legal standard. However, because the record supports the consolidation of the offenses, we cannot say that the court's error more probably than not affected the judgment. Therefore, we further conclude that the trial court's error was harmless.

## III. Exclusion of Evidence

The defendant contends that the trial court erred by excluding the testimony of Felicia Hester, the defendant's cousin. The record reflects that the trial court excluded part of Felicia Hester's testimony after finding that the testimony was irrelevant.

---

[2] *See infra* Part V

When viewing a claim regarding the trial court's exclusion of evidence on the grounds of irrelevance, this court will not disturb the decision of the trial court absent an abuse of discretion. *See State v. Dubose*, 953 S.W.2d 649, 652 (Tenn. 1997). Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Even relevant evidence, however, may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* 403.

Felicia Hester testified during a jury-out hearing that at some time years before the victim's death, she overheard the victim's sister say that her private part hurt and say that someone named Bullet did something to her. Ms. Hester did not know Bullet's real name, when this occurred, how old the victim's sister was at the time, or what, if anything, was done about the situation. Ms. Hester also testified that she witnessed Angela Mason spank her children. The trial court found that her testimony regarding Bullet was irrelevant because she could not provide a specific timeframe or location. The trial court stated that Ms. Hester could testify that she witnessed Ms. Mason spank her children, but the defense did not call Ms. Hester for that testimony.

We conclude that the trial court did not abuse its discretion by excluding Ms. Hester's testimony based on relevance. The excluded portion of her proffered testimony had no bearing on any fact pertaining to the defendant's guilt or innocence. Even if marginally relevant to some issue, Ms. Hester's testimony could have properly been excluded under the considerations of Rule 403. Therefore, the defendant's argument is without merit.

## IV. Admission of Evidence

The defendant claims that the trial court erred by allowing the state to introduce the defendant's juvenile record to impeach Annie Hester's testimony. The record reflects that during a jury-out hearing, the trial court specifically ordered the state not to use the defendant's juvenile court adjudications. In the state's cross-examination of Ms. Hester, the following exchange took place between the state and the witness:

[STATE] Q. When he was young, you said he never got in any trouble, never got in any fights. Those weren't true statements were they, ma'am?

[WITNESS] A. He said what had happened at school.

Q. No, ma'am. He said when he was young. Those weren't true statements, were they? Because he did get in some trouble, didn't he?

A. Okay. When he brought that up - -

Q. Did he get in trouble - -

A. - - I remember - -

Q. No, ma'am - -

A. - - when he brought it up, yeah.

Q. I don't want to go into any specifics. Let's just - - listen to my question. He did get in some trouble, didn't he?

A. Yeah.

Q. And he did get in some fights, didn't he?

A. Yeah. After he brought it up, I remember.

Q. So what you told these folks the first time wasn't quite true, was it, ma'am?

A. (No audible response)

Defense counsel did not object to the state's questioning about "some fights" that the defendant was in during his youth.

In most cases, the failure to raise a contemporaneous objection to the admission of evidence at the time the evidence is introduced at trial results in waiver of the particular issue on appeal. *See* Tenn. R. App. P. 36(a); *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). However, an objection is considered contemporaneous if counsel makes the objection in a motion in limine and the particular issue is considered and ruled upon. *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001). In such cases, counsel is not required to make repetitious objections to issues which have been previously ruled upon in order for that issue to be preserved for appeal. *Id.* Nonetheless, counsel must be vigilant to object contemporaneously to issues which are only tentatively suggested or incompletely developed in connection with a motion in limine, otherwise, counsel risks waiver of the issue on appeal. *Id.*; *see also State v. McGhee*, 746 S.W.2d 460, 462 (Tenn. 1988).

While there was no written motion in limine in this case, the particular issue of the use of the defendant's juvenile record to impeach Annie Hester's testimony was considered and

ruled upon by the trial court. However, that ruling was limited to juvenile court adjudications and contained no mention of the vague reference to "some fights," about which the state questioned Ms. Hester. Therefore, we consider the reference to "some fights" in the state's cross-examination to be an issue only tentatively suggested by the trial court's ruling, and we conclude that defense counsel should have contemporaneously objected to the questioning to avoid waiver of the issue. Thus, with no contemporaneous objection, the defendant has waived appellate review of this issue. *See* Tenn. R. App. P. 36(a).

## V. Sufficiency of the Evidence

The defendant contends that the evidence was insufficient to support his convictions for felony murder, aggravated child abuse, and aggravated rape of a child. Specifically, the defendant contends that the medical evidence introduced at trial revealed contradictory causes of death and that the state presented no evidence that the defendant sexually penetrated the victim.

It is well-established that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); *see also* Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002).

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe*, 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude

every other hypothesis except that of guilt. *See State v. Dorantes*, 331 S.W.3d 370, 380 (Tenn. 2011) (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140, 75 S. Ct. 127, 99 L. Ed. 150 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

Relevant to this case, felony murder is the killing of another committed in the perpetration of or attempted perpetration of aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2). A murder qualifies as felony murder if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999).

To sustain the defendant's conviction for aggravated child abuse, the state had to prove that the defendant committed the offense of child abuse or neglect, and the conduct resulted in serious bodily injury to the child. *See* Tenn. Code Ann. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." *Id.* § 39-11-106(a)(2). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(34)(A)-(E).

To establish aggravated rape of a child, the state was required to prove "unlawful sexual penetration of a victim by the defendant . . . if the victim is three (3) years of age or less." Tenn. Code Ann. § 39-13-531(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7).

Taken in the light most favorable to the state, the evidence presented at trial showed that the victim was healthy and without injury when her mother washed her the morning of March 3, 2008. The two-year-old victim was alone with the defendant and her three-year-old

sister from approximately 5:46 a.m., when her mother clocked into work, until the defendant brought her to her grandmother's house, at which time she was unresponsive. She was airlifted to LeBonheur, where Dr. Lakin noted that she had active bleeding from her anus and indications of head trauma. CT scans and emergency surgery revealed that the victim's brain was actively hemorrhaging, causing herniation. Despite the LeBonheur staff's efforts, the victim died. Dr. Chancellor's autopsy revealed tears around the victim's anus, bruising of the perirectal tissue that extended two inches upward from the anus, four deep scalp contusions, a subdural hemorrhage on the right side of her brain, multiple areas of acute subarachnoid hemorrhage, a brain contusion on the left side, and a left uncal herniation. Dr. Chancellor testified that the victim died of multiple blunt force trauma to her head and that the bruising to the perirectal tissue indicated penetration. Dr. Chancellor also testified that a fall from shoulder height would not have caused the victim's injuries and that the victim's injuries were all approximately the same age. Based on this evidence, we conclude that a rational trier of fact could find that the defendant caused the victim's head injuries, that the head injuries were not caused by accidental means, and that the victim died of those head injuries. We further conclude that a rational trier of fact could find that the defendant was responsible for penetrating the victim's anus by some means. The jury resolved any alleged inconsistencies in testimonies in favor of the state. The evidence was sufficient to sustain the defendant's convictions; therefore, the defendant is without relief in this matter.

**Conclusion**

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE